Filed 5/17/23  In re A.F. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re A.F. et al., Persons Coming Under the Juvenile Court Law. | C096679 |
| SACRAMENTO COUNTY DEPARTMENT OF CHILD, FAMILY AND ADULT SERVICES,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>J.F.,<br><br>    Defendant and Appellant. | (Super. Ct. Nos. JD241003, JD241004, JD241005) |

1

Appellant J.F. (father) is the presumed father of minors A.F., E.F., and Ja.F. (collectively, the minors). Father contends only that the juvenile court erred by finding the beneficial parental relationship exception did not apply to prevent the termination of parental rights. (Welf. & Inst. Code, §§ 366.26, 395.)[1] We disagree and affirm the orders of the juvenile court terminating parental rights.

FACTUAL AND PROCEDURAL BACKGROUND

*Initial Dependency Proceedings*

On December 7, 2020, the Sacramento County Department of Child, Family and Adult Services (Department) filed petitions alleging that A.F. (then age two years), E.F. (then age four years), and Ja.F. (then age six years) came within the provision of section 300, subdivision (a) (serious physical harm), and section 300, subdivision (b)(1) (failure to protect). The petitions alleged that there was severe domestic violence between mother, S.F. (mother), and father (collectively, the parents) in the presence of the minors. The violence included head-butting, hitting each other with household items, and father burning mother on her face with a "torch lighter" while A.F. was on her lap. The minors were placed into protective custody.

The Department's detention report stated that between April and November of 2020, there were 22 family disturbance calls to the family's home. Starting in July 2020, the Department began receiving referrals for domestic violence between the parents in the presence of the minors. Mother claimed that the domestic violence allegations were false, and she refused to allow the minors to be interviewed. The sheriff's deputy who responded to the domestic violence call at issue here reported that mother told him father burned her face with a "torch lighter" while the minors were in the room; the deputy observed mother had "bruising and redness" to her face. Father was arrested. The maternal grandmother reported that she believed both parents used drugs and that father

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

had also assaulted her (the grandmother) in the presence of the minors. Mother tested positive for methamphetamine on September 12, 2020.

At the initial detention hearing on December 15, 2020, the juvenile court ordered the minors detained and designated father provisionally presumed.

*Jurisdiction and Disposition*

The Department's January 19, 2021, jurisdiction and disposition report disclosed that on January 11, 2021, mother was admitted to the emergency room after father pushed her through a window; she received a blood transfusion and 42 staples. She admitted the domestic violence began in 2015 and described some of the physical domestic violence incidents that occurred throughout the years, but claimed father burned her by accident in November 2020 with the torch lighter (when he was "hitting the bong" with it) and A.F. was not on her lap at the time, claiming she had " 'lied' " to law enforcement and CPS. Father insisted there were only a few domestic violence incidents and mother was the aggressor. E.F. reported that father hit him with a belt. Ja.F. denied any hitting or yelling in the home, but the Department reported Ja.F. would start hyperventilating and struggle to breathe when father visited. The maternal aunt reported that all three minors had witnessed multiple incidents of domestic violence between the parents.

The Department recommended sustaining the petitions, removing the minors from the parents' care, and providing reunification services to the parents. The case plans consisted of a domestic violence program, anger management, psychological care, counseling, parenting education, and substance abuse testing.

In February 2021, the Department filed an addendum report noting that it continued to receive information that the parents were engaged in family disturbances, with law enforcement being called to the family home in January and February 2021, and father "crying" and telling the social worker that mother was smoking drugs and needed

3

help.  On or around February 16, 2021, mother gave birth to a baby, the minors' sibling, I.F.[2]

On May 10, 2021, the juvenile court held the combined jurisdiction and disposition hearing, sustained the allegations in the petitions, and made the findings and orders recommended in the Department's disposition report.  The court removed the minors from the care of the parents and ordered reunification services.

*Status Review*

The Department's October 5, 2021, six-month status review report recommended terminating reunification services and setting a selection and implementation hearing under section 366.26 as to all four minors.  Father stated that he was still involved in a romantic relationship with mother until the end of July 2021, despite an active restraining order.  The Department found there was a new restraining order granted on September 13, 2021, due to a new domestic violence incident between the parents.  The report showed the minors were doing well in their placement and were developmentally on target; Ja.F. was the only child who required speech therapy and individualized education.  The Department reported that mother had completed a few items on her case plan, partially participated in others, refused to do some of the services, and had recently moved out of the county to obtain services with a domestic violence victim agency.

While father had completed individual counseling, anger management and domestic violence as a perpetrator, he had not participated in parenting education, domestic violence as a victim, random testing, or further alcohol and drug assessments despite admissions of alcohol and marijuana use.  There were also two domestic violence incidents that occurred during the reporting period.

---

[2]  I.F. is not a subject minor in this appeal.  An additional section 300 petition was filed as to the infant I.F. on February 19, 2021.

Both parents participated in visitation with the minors, and father was very consistent with visits except for when he was incarcerated. The visit supervisor observed that E.F. and A.F. did not cry at the end of visits with father. However, the minors were often excited to see father, who was appropriate during visits.

In an addendum report, the Department reported father was again participating in anger management and domestic violence for perpetrators. He had not begun parenting education, the additional individual counseling, the AOD assessment, Narcotics Anonymous meetings, or drug testing; he had only attended one codependency group session. Additionally, the Department obtained police reports for the September 2021 domestic violence incidents, showing mother went to the hospital after the first incident and father was arrested after the second incident. The parties subsequently requested to resolve the case with continued reunification services to the parents, for which the juvenile court accepted the resolution and set a 12-month review hearing.

In its January 20, 2022, 12-month status review report, the Department recommended that the juvenile court terminate reunification services and set a section 366.26 hearing. The minors were generally healthy and developmentally on target; E.F. had a pending speech/language assessment, and Ja.F. continued weekly speech therapy and individual education. They had lived together with the same foster parents, who were committed to adoption, since December 7, 2020. Father had restarted anger management and domestic violence offenders counseling, but he had still not engaged in individual counseling, parenting education, drug testing, or outpatient treatment; he had only participated in a few sessions of codependency groups and one session of domestic violence for victims.

Father's visits were reported as appropriate, the minors were happy to see him, and he brought toys and food to the visits. The Department's summary of visits showed that father was generally attentive during visits, assisted the minors with eating, and played with them.

Following a trial, the juvenile court, on March 1, 2022, terminated the parents' services and set a selection and implementation hearing pursuant to section 366.26.

*Section 366.26 Hearing*

The Department filed a June 28, 2022, section 366.26 report in advance of the section 366.26 hearing.  As relevant to the sole claim on appeal, the report stated that E.F. and Ja.F. had an "age-appropriate understanding of adoption and reported wanting to be adopted by the current caregivers."  The Department recommended termination of parental rights, as the minors were likely to be adopted and there was no applicable exception to termination of parental rights.  In reaching its recommendation, the Department noted only A.F. readily accepted affection from the parents whereas E.F. and Ja.F. were more hesitant.  The parents tended to spend a portion of their visits talking about each other or their own problems rather than focusing on the minors.  The minors reportedly did not have difficulty separating from their parents at the end of visits.  Both parents set the case for trial.

At the trial on July 22, 2022, mother testified about her bond with the minors, and stated with respect to the minors' foster home:  "It seems to be a really good home.  They seem to be okay going back home.  They call it home."  Father testified that he had an "amazing" bond with the minors and because he was an only child, it would be hard on him for his children to be adopted.  Father testified that during visits, the minors all ran up to him and called him, "daddy" or "dad."  Father testified that when the visits end, "[i]t's more hard on me th[an] them."  He also testified broadly that the minors "want to come home," but did not elaborate.

The juvenile court found that there was clear and convincing evidence that it was likely the minors would be adopted, none of the exceptions pursuant to section 366.26, subdivision (c)(1) existed, termination of parental rights would not be detrimental to the minors, and it was in the best interest of the minors to terminate parental rights.  As to the beneficial parental relationship exception, the court found as to father that the first two

6

elements were met--consistent visitation and a significant positive emotional attachment. But the court then found that father failed to meet his burden to show the level of detriment to the minors in terminating parental rights would outweigh the benefit to the minors of placement in an adoptive home. The court reasoned that, while the visits were positive and there was a strong "love and bond that flows from [father] to his children, . . . there is not really any indication or evidence in front of the Court that the children will suffer a significant level of harm if that relationship is terminated." The court noted there was always a benefit to the children of ongoing contact with their biological families and always some level of detriment to terminating parental rights, but the issue is "the level of detriment for the children." The court reasoned that it did "not appear in any way the children's daily lives will materially change," and there was insufficient evidence to show termination of parental rights would be detrimental to the minors. The court noted it considered "the security and stability of a new and permanent home and all the benefits that come along with . . . the children being allowed to be adopted and have parents who are committed to raising them and the benefits that are happening for these children." The court also noted that it gave "little weight" to the wishes of E.F. and Ja.F. to remain with the caregivers, as reported. The court then ordered parents' parental rights terminated and freed the minors for adoption.

Father filed a timely notice of appeal.

### DISCUSSION

Father contends the juvenile court erred in failing to find the beneficial parental relationship exception to adoption applied based on his relationship with the minors. He argues that the juvenile court erred in its analysis under *In re Caden C.* (2021) 11 Cal.5th 614, 629 (*Caden C.*) because the evidence supported application of the exception. We disagree.

At the section 366.26 selection and implementation hearing, a juvenile court must choose one of the several " 'possible alternative permanent plans for a minor child. . . .

7

*The permanent plan preferred by the Legislature is adoption*. [Citation.]' [Citation.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child." (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.) There are only limited circumstances that permit the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) One such circumstance is the so-called beneficial parental relationship exception. (§ 366.26, subd. (c)(1)(B)(i) [beneficial parental relationship exception]; *Caden C., supra*, 11 Cal.5th at p. 629.)

The party claiming the exception has the burden of establishing the existence of any circumstances that constitute an exception to termination of parental rights. (*Caden C., supra*, 11 Cal.5th at pp. 636-637; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252; Cal. Rules of Court, rule 5.725(d)(2).) The parent "must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C.*, at p. 636.)

The beneficial parental relationship exception to adoption "must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) The factual predicates of the exception must be supported by substantial evidence, but the juvenile court exercises its discretion in weighing that evidence and determining detriment. (*Caden C., supra*,

11 Cal.5th at pp. 639-640.) We do not substitute our judgment for that of the juvenile court as to what is in the child's best interests. (*Id.* at pp. 640-641.)

Here, the fact that father consistently visited the minors was undisputed. As to the second element, the juvenile court found that there was a significant positive emotional attachment between father and the minors. As to the third element, the juvenile court conducted a detailed analysis under *Caden C.* and concluded father did not meet his burden to establish that termination of the positive attachment would be detrimental to the minors. After removal, the minors spent over one and a half years in their placement with their caregivers, where they thrived, while father's contact with the minors was limited to visits. The juvenile court noted those visits were generally positive but focused on the lack of evidence that the minors would suffer any significant detriment without ongoing parental contact.

Additionally, we observe that father's testimony focused on the detriment *he* would experience from the loss of a relationship with the minors rather than the detriment *the minors* would experience. He testified that it would be hard on him for his children to be adopted and that when the visits end, "[i]t's more hard on me than them." This is consistent with mother's testimony that the minors were happy in their placement and the elder two minors' own expressed wishes to be adopted by their caregivers. It is also consistent with the court's reasoning that it did "not appear in any way the children's daily lives will materially change." As the Department reported, E.F. and Ja.F. were hesitant to accept affection from the parents, and none of the minors had difficulty separating from the parents at the end of visits.

While father contends that adoption will bring no particular benefit to the minors such that the benefit of adoption would outweigh the detriment of severance from father, he does not meet his burden of showing a detriment within the meaning of *Caden C.* He emphasizes that "there is no evidence that had the trial court found the parental-benefit exception applicable, the children's committed caregivers would not have agreed to a

9

legal guardianship," rather than supporting a reasoned argument that he met his burden of showing detriment and the juvenile court's finding to the contrary was not supported by substantial evidence. In light of the evidence in the record that we have set forth *ante*, as well as the stability the minors enjoyed in their caregivers' home and the evidence that the elder two minors both told the social worker they wished to be adopted, there was a dearth of evidence demonstrating the minors would suffer detriment if parental rights were terminated.

Having considered both the evidence and oral argument, and noting father had the burden to show the exception applied, the juvenile court found there was insufficient evidence of detriment, appropriately comparing the harm caused by termination of the parental relationship to the benefits of an adoptive home, as required under *Caden C.* (See *Caden C., supra*, 11 Cal.5th at p. 632 ["[I]n assessing whether termination would be detrimental, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home"].) We conclude the juvenile court's finding is well-supported by the record. The court did not err in finding the beneficial parental relationship exception did not apply.

DISPOSITION

The orders of the juvenile court are affirmed.


_____/s/_____
Duarte, J.


We concur:


_____/s/_____
Mauro, Acting P. J.


_____/s/_____
McAdam, J.*

_____

\* Judge of the Yolo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.